SHAUGHNESSY v. CITY OF NEW YORK. (No. 6638.)

(Supreme Court, Appellate Division, First Department. December 31, 1914.)

1. MUNICIPAL CORPORATIONS (§ 352*)—CONTRACT FOR SNOW REMOVAL—CONSTRUCTION.

   Where a contract for removal of snow from city streets provided that payment should be made on the basis of the snow and ice "actually removed," "subject to measurement," determined by "inside measurements * * * in every case," it contemplated that payment should be made according to actual measurement, and that the snow and ice should be heaped up, though the contract contained a schedule of the capacity of the vehicles most likely to be used and specified that they must be heaped up.

   [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 883; Dec. Dig. § 352.*]

2. MUNICIPAL CORPORATIONS (§ 364*)—CONTRACT FOR SNOW REMOVAL—BREACH—RIGHT TO DAMAGES.

   Where a contract for removal of snow from streets requires that payment be made on the basis of the snow and ice actually removed, and the foreman and inspectors representing the city refuse to issue vouchers on which the contractor's haulers may demand pay unless their loads are heaped up, in consequence of which many of them discontinue work,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and the contractor, being unable to carry out his contract, lost his antici-
pated profit, the city is liable.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §
897; Dec. Dig. § 364.*]

3. MUNICIPAL CORPORATIONS (§ 364*)—CONTRACT FOR SNOW REMOVAL—BREACH
—LIABILITY OF CITY—EXTENT.

Where a contract for snow removal empowered the commissioner of
street cleaning to suspend work at any time, the city was not liable to
a contractor because of the melting of snow before it could be carted
away after being piled up ready for carting, though the commissioner,
in a manner not shown to be unlawful, had ordered discontinuance of the
carting prior to the melting of the snow.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §
897; Dec. Dig. § 364.*]

Ingraham, P. J., dissenting.

Appeal from Trial Term, New York County.

Action by John F. Shaughnessy against the City of New York. From
judgment for defendant, and denial of new trial, plaintiff appeals. Re-
versed, and new trial granted.

Argued before INGRAHAM, P. J., and LAUGHLIN, SCOTT,
DOWLING, and HOTCHKISS, JJ.

Edward M. Grout, of New York City, for appellant.
William E. O. Mayer, of New York City, for respondent.

SCOTT, J. Plaintiff was a contractor with the city of New York
for snow removal during the winter of 1907–08. He had a contract
covering four districts. The cause of action which was dismissed was
for damages for the refusal of the city to permit him to carry out his
contract according to its terms. He exhibits two grievances. First,
that the inspector and foreman refused to measure the loads of snow in
accordance with the terms and meaning of the contract, in consequence
of which the cartmen, whom he had employed to do the work of cart-
ing, refused to go on with it; second, that the city, by its officers and
employés, refused to permit him to remove, on February 12, 1908, snow
which he had piled up ready for removal, in consequence of which the
snow so piled melted and ran away.

[1, 2] The contract in question provided for compensation to the
contractor at a given rate per cubic yard of snow removed and dumped
at the places designated for that purpose by the commissioner of street
cleaning. This price covered the labor involved in sweeping up and
piling the snow ready for carting, as well as the carting and dumping.
It is a matter of common knowledge, and was proven upon the trial,
that a contractor for snow removal is compelled to arrange in advance
for the use of carts and vehicles of all sorts and descriptions and of
varying capacities. The city, in this year, prepared a form of contract
under which it undertook to pay for snow removed on the basis of snow
and ice "actually removed," and this phrase or its equivalent runs all
through the contract and specifications. It also adopted and incorpo-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

rated into the contract a schedule of the best-known styles of carts and vehicles likely to be used in the work, dividing them into classes as to their carrying capacity. The following was the schedule:

"A. One and one-half cubic yards. One-ton coal carts, private ash carts, and the ordinary dirt cart used on street railway work, containing one and one-half cubic yards (some of these hold from 1.3 to 1.6 cubic yards water measure, and must be heaped up in all cases.

"B. Three cubic yards. Two-ton coal carts, manure carts, asphalt wagons, also brick trucks, having extra strip of six inches above their sideboards (but not otherwise, and subject to measurement).

"C. Four and one-half cubic yards. Three-ton coal carts, furniture wagons, and vans (subject to measurement and containing four and one-half cubic yards).

"D. Six cubic yards.

"E. Vehicles too large to be covered by the above. *Inside measurements are to be given in every case,* and are to be made by the loading foreman, subject to verification by the district superintendent. When a vehicle is put to work the loading foreman must immediately punch, on the ticket issued for the vehicle, the letter indicating the capacity of the vehicle, according to the above schedule."

As each vehicle was loaded the city's foreman or inspector marked it with a letter indicating its class as estimated by him, and gave the driver a ticket indicating the amount of the load. This ticket, after being stamped at the dump, constituted the contractor's voucher for payment. The contractor's agreement with those from whom he hired the vehicles was that they should be paid a given price per cubic yard according to the yardage paid for by the city.

It will be noticed, on reference to the schedule, that only as to one class, the smallest, was it provided that the load must be heaped up. As to the other classes the words "subject to measurement" are used. The instructions given to the foreman and inspectors were that each vehicle should be "fully loaded," or "loaded to its full capacity." The difficulty arose in this way. The foreman measured each vehicle at what is called in the case the water line; that is, the capacity was measured for the purpose of classification as if the vehicle was to be loaded only flush with the top. Snow and ice can be so heaped up as that a vehicle will carry appreciably more than a load of water line capacity, and the foremen on the occasion of the first snowstorm upon which the plaintiff was set to work, while rating the vehicles according to their water line capacity, also insisted that the loads should be heaped up, with the result that each vehicle, above class A, was required to cart away an amount of snow appreciably greater, and in the case of the larger vehicles considerably greater, than the amount shown by the ticket given to the driver and for which plaintiff was to be paid.

Under this system the contractor was allowed for less than the amount "actually removed," and the basic principle upon which the contract was drawn and executed was persistently violated. It would appear that the higher officials in the street cleaning department perceived the injustice of this method, and gave instructions that a different system should be adopted; but for some reason the foremen and inspectors on the work persisted in following the course indicated. The contractor and his drivers were absolutely at the mercy of the foremen

and inspectors, for, unless the loads were made up as required, no tickets would be issued, and the contractor would receive no vouchers upon which to demand pay under the contract. This course of procedure not only deprived the contractor of what he was entitled to receive from the city, but gave to the owners of vehicles hired by him less compensation than they had expected to receive, with the result that a large majority of them refused to continue at work, as a consequence of which he was unable to go on with the contract, and the city hired vehicles itself and carted away the snow, and the contractor not only lost the anticipated profit from the contract, but was not even paid the expense to which he had been put in piling up the snow ready for removal.

In our opinion the true construction of the contract required that the contractor should be paid for the snow actually removed, and to that end that the amount of snow included in each load should have been estimated or measured in each case, and not merely the water line capacity of the vehicle. Only by this means could the often declared purpose of the contract be carried out, and, as we consider the words used in the classification, "subject to measurement" distinctly indicates that this was the intention of the contract, especially when contrasted with specific provisions, as to class A, that it should be estimated as containing 1½ cubic yards and "must be heaped up." If it had been intended that every class should be classified according to its water line measurement, and yet must be heaped up, it would have been a simple thing to say so, and the fact that it was said as to one class, and was not said as to any other clearly indicates that the rule was to be applied to the one class, and not to the others.

The suggestion by the learned trial justice that the contractor should have insisted upon loading the larger vehicles only to the water line would have been impracticable, because, as already pointed out, the contractor in that case would not have received the tickets upon which his pay depended. That this is the true construction of the contract, as it was understood by the responsible officers of the street cleaning department, is indicated by the fact that on the occasion of a later snowstorm a different practice was adopted, and the snow as actually loaded was measured and allowed for; specific and definite instructions being given that all vehicles should be classified according to the "heap load" carried.

Our conclusion as to this branch of the case is that plaintiff was unjustly prevented from carrying out his contract, assuming that the facts offered to be proved can be proved, and that he has a just claim for damages therefor.

[3] As to the second grievance exhibited by plaintiff, we are of opinion that he cannot recover. By the terms of the contract the commissioner had power to suspend the work at any time, and it is not alleged that in ordering the discontinuance of carting on February 12, 1908, he acted unlawfully for any reason. The chance that snow which had been piled up ready for carting may melt away before it is actually carted is one which a contractor for snow removal must always take. It is doubtless unfortunate for the plaintiff that the suspension of carting and the

falling of a heavy warm rainstorm coincided as to time; but we can see no ground for a claim for damages against the city.

The judgment and order appealed from must be reversed, and a new trial granted, with costs to appellant to abide the result.

LAUGHLIN, DOWLING, and HOTCHKISS, JJ., concur.

INGRAHAM, P. J.   I dissent, as I think the judgment should be affirmed.